representing the plaintiff in this ADA case where it was up for summary judgment. The summary judgment was approved, however, the judge's order was pretty clear except he did come up with the fact that the interactive process wasn't followed by my client and therefore felt that the summary judgment should be approved. The court did find that my client did have a disability, the court did find that he's able to perform the essential functions of his job. Most of the problems started in July of late 2011. Can I ask you one question about the disability? Was there evidence, I didn't see it in the doctor's notes, I agree with you about the disability and the interference with the endocrine system, was there evidence that the motion sickness that he experienced in the control room was tied to that disability? Yes, I believe that was in the doctor's notes and also that the agency had determined that based on the doctor's notes that they would assign him to see if he could perform his duties. I thought the doctor's notes just said it's motion sickness so he can't be in the control room but didn't kind of link it to you know the condition that he had. Well from what I can tell from the medical history that the motion sickness is just a symptom of the pituitary problem and that it goes in conjunction with that and affects the endocrine gland. You know I was wondering the very same thing. I was wondering if you you know might discuss what the record tells us about a connection between the hypothyroidism and his motion sickness and whether such a connection matters here. Well I believe that the judge properly ruled in that. I understand that the defendant is Well I thought the judge ruled that his condition was a disability because it interfered with the life function of the endocrine system, the major life activity. But this connection is just what I'm getting at because if I if I went in and said I had motion sickness that would not necessarily count as a disability under the act, right? Like you need to tie it to his condition and I'm just wondering what evidence tied it. Are you relying on any inference that it seems logical that someone who had the pituitary gland removed would experience motion sickness? I would agree with court that that probably is something that could have been clarified more had the case gone to trial where we'd have been able to present the treating doctor so that that person could explain the connection as this court is concerned. Although to survive summary judgment you have to have sufficient evidence in the record already that you can point to that would permit a reasonable jury to draw that conclusion. But I think that the court did find that there was enough evidence to show that it was a symptom of the underlying condition. And I think that's what the argument of the defendant is that because of motion sickness is motion sickness that how can it be related to the the pituitary problem. But you still haven't said what you just keep saying that the district court found that it was. But my question is what was the evidence showing the link? I can only refer to just the doctor's notes and also the fitness for duty. Where the fitness for duty also indicated that he had different problems when he'd be in the control room because of the dizziness that would be generated by the the sounds of the machinery, by the whirring of the machines, by the view. So that even their own doctor had determined that he needed a restriction that would make it capable of him performing the duties for his position. Now again that was not really the essential function of his job to work the control room. But I'd like to get back to the interactive process. I really believe that there was a breakdown in that after the doctor, the agency's doctor, had determined that he needed restrictions. Shortly thereafter it was determined by agents of the judge that they couldn't, he couldn't perform the essential functions of the job therefore we're going to put him on disability leave. Wherein started the problem. The thing at the time when it was looking at the restrictions of what he could do what he couldn't do there was really no discussions of what they expected of him outside of we we need you to work in control room. But they knew at the time that it was only a temporary position but they didn't tell him. And so after that he goes on disability and he has to give a report month after month after month and in the we get to a point where I guess he felt frustrated that it's not doing anything they're not talking to me. We're not just dealing with this issue. I'm going to just find another job. So let me articulate it in terms of the legal standard for the interactive process. You're saying that a reasonable jury could find that the employer engaged in the interactive process in bad faith and so that the fault can't be put on Mr. Youngman. And that's because at the time of them putting him on the disability leave that they knew that it was only a temporary job and or temporary restriction that he would only take and work on it once in a while. He also agreed to work on that an emergency basis. So there was no question. What responsibility was it to clarify that Mr. Youngman could work in the control room on an emergency basis? That that's correct. He also had even after he was put into showing he had restrictions he was still required to work in the control room and he did. My question is whose responsibility was it to clarify that he could work in the control room on an emergency basis? In this particular case your honor it would be the employer because the employer had information that he should have shared with my client. That being that oh this is only going to be temporary or on an emergency basis. That wasn't given to him and they knew there was only temporary. Had he known there was only had Youngman known it was only going to be temporary and he could have talked to his his treating doctor we wouldn't probably even be here today because he would have gainfully kept working for them under the restrictions of working temporarily or even two or three days in a month. Now remember too that... Did they even have to talk to his doctor or could they have just talked to him? To Mr. Youngman? I'm saying they should have talked to Mr. Youngman. They should have indicated that it was only going to be on a temporary basis. They knew at the time that they put him on disability leave that it was only going to be temporary. Counsel let me ask you a question about the process. So they said you have to work in the control room and he says the accommodation I seek is that I not have to work in the control room and they said no you have to work in the control room. That's correct. So at that point but this kind of goes to Judge Rovner's question too. At that point whose responsibility is it to come up with the next proposal to say how about if I just work in the control room for a day at a time and I break it up because I can do it for a day. Was that Mr. Youngman's responsibility or was that the employer's responsibility to come back and say nope we need you in the control room but we can talk about doing it for shorter spurts? I would believe that the court's correct in that that they we need to look at the employer's expectations of what they're willing to do if they're saying under no conditions are we ever going to allow you not to work in a control room. That then leaves it up to my client to decide if he wants to work in a different position with the company. So you're saying your client should have made a counteroffer. I'm wondering the interactive process is a give-and-take you know they go back and forth your client said what he wanted the employer said no. At that point to act in good faith in the interactive process who comes up with saying you know what about if I just did it on a temporary emergency basis or what about if I didn't do it for a week straight but I did it for half a day. Whose responsibility was that? I'm not sure that that is something my client could do based on what he believes. He'd be reading the mind of the employer. So the employer should have made that offer and said listen you know what we can't exempt you entirely but we'll exempt you for a shorter period? That wouldn't be a logical step your honor. I believe that if there's something that they're willing to do if they also have another position that he could potentially do outside of the control room that could have been discussed with him too. I don't think it should have been up to him to say I know if I take this other position change my job title that this will be fine because it'll be within my type of disability. I don't think he had that option. I don't think that it was even discussed of potentially doing something different. The only thing on the table was our way or the highway. I believe I know you can save your time for rebuttal. Thank you. Mr. Siegel. Good morning. May I please the court. Assistant Attorney General Evan Siegel on behalf of Chief Judge Paul Gilliffin of the Illinois Circuit Court for the 10th Judicial Circuit. Good morning counsel. I want to launch right in and answer some of the questions that the court just posed to opposing counsel. On the question that your honor asked about whether there's any evidence in the record tying these medical conditions of acromegaly and hypothyroidism with calcium deficiency to motion sickness. There isn't. It's not in the doctor's notes. I'm not sure what counsel is referring to but the record shows I those terms appear period link or no link is in the EEOC charge and the corresponding charge of the Illinois Human Rights Commission. And there's no connection at any point from the two principal doctors who examined Mr. Youngman that there is a linkage between motion sickness on the one hand and these conditions. The linkage if any is between the motion sickness that Mr. Youngman had and his placement in this control room which is about 24 by 19 feet. I also want to address a premise or a concept that counsel keeps referring to which the record doesn't support that placement in the control room was going to be a temporary position and we knew somehow that it was going to be temporary, failed to communicate that. Well the fact is that placement in the control room is required, was required going back to a reorganization and a reassignment of job responsibilities in 2010 for everyone. And there are seven people on this shift. This first shift that Mr. Youngman was a part of. He reported to Ms. Kramer and Brian Brown was above all of them. Simple math. Seven people, 365 days. Each person had to do it around 45 and 46 times excluding emergencies. So it's it's basically a weekly slotting. Maybe more if there's an emergency or an interactive process that Mr. Youngman could have worked in the control room on some limited or occasional basis. That was never communicated. You knew he had done so for nine days. You knew he had done so for nine days. I'm sorry I didn't catch the question Judge So you knew that he could work there and that he had successfully worked there. That's that's that's right we did know that he could work there but at the key point when he went when he left on sick leave and had an appointment with Dr. Youngman in early August, his statement to us through the doctor was adamant and categorical. He couldn't work in the control room at all. Dr. Youngman said that he couldn't perform any job there due to noise from the monitors, exposure to the lights, etc. A few days and that's based on just a note from the doctor. There was no medical examination. Then a few days later, August 5th, Dr. Dering stated after examining Youngman that he was having motion sickness related to the room and Dr. Dering recommended that Youngman not work in the control room other than briefly going in and out but rather than he be placed elsewhere. So to your point Judge Barrett, there was sort of a loggerheads initially and one that process from August of 2012 until a year later and I believe the council said that somehow the interactive process broke down with us but that's not the case. Brown is not a medical professional. He doesn't have a crystal ball. He's not a mind reader. He attempted at multiple junctures as did our human resources department to find out, to test the limitations and the extent of these problems and at each juncture we received no further information, no statement. Forgive me for interrupting you but nothing about Mr. Youngman's condition had changed. Nothing was going to change and Superintendent Brown had already rejected the accommodations that Mr. Youngman wanted before he was placed on medical leave and Mr. Youngman had filed a charge of discrimination so I'm not certain that it matters that Mr. Youngman stopped submitting updates and empty act. Superintendent Brown had painted this all with a very broad brush that he couldn't work anywhere in the facility when in actuality it was only that one room that was the problem. Well two things your honor. Actually there was medical testimony from Dr. Howder that in the record that Youngman would be a danger to himself and others anywhere in the facility and we have to keep in mind that Youngman took himself out of not just one job but two out of the three jobs. I thought he just took himself out of the control room. He did your honor but the means that that person comes into the control room as needed on a necessary basis if there's a sudden emergency in the facility because of a fight between juveniles or someone is sick and can't be assigned there. So all that he supposedly would be able to do is work with the juveniles themselves in the living facilities but I want to bring this back to the legal standard because this court's decisions make clear that when it's the employee who has critical concrete information that can help facilitate the interactive process the employee must come forward and provide that to the employer. So what was the information he should have provided here? He should have said at some point nowhere in the record until the reply brief and during litigation you know I could have worked in the control room maybe 15 minute intervals or for an hour or partial shift or if you really needed me on an emergency basis I could come in in there. That was never communicated and we didn't have that information to determine within our discretion whether or not that was feasible and it is a like the Cote case to entrust the staffing responsibilities to the director. So Mr. Siegel what legal standard because I think on the interactive process point it is kind of difficult I didn't see any case that was on all fours where you have the employer and the employee going back and forth you know he says so in a negotiation he starts big you know he says I went out of the control room all together and the employer says nope you can't have that who makes the counteroffer is it you're saying it's always the job of the employee to say like okay well you won't give me entirely out of the control room but I think I could tolerate it for a day. It seems to me like it's a give and take maybe both parties are supposed to. Well there is a strain that's true Your Honor but there is a strain in this court's decisions in cases like Brown and Reeves where the onus is on the employee a bit more and that makes perfect sense right because the employer can't guess at what medical conditions or limitations the employee is facing. The employee between him and his doctors has that information and to tie this to something that Judge Rovner was asking we can't just focus on the breakdown in communications that happened in after Youngman stopped submitting his status reports around between April and August of 2013 we have to look at the period of time when Youngman and the HR officer at the center were repeatedly asking the doctors and Youngman for additional information. What can you do? How can we help you? What are your limitations? This happened again and again. I got up to August 5th I think in the record but I think it's worthwhile for me to walk through what else happened because it's not just this end period it's every the interactive process begins immediately and it did because within hours of Youngman leaving work early August and supplying that note from Dr. During Brown asked for additional information. The initial examination by Dr. During was not medically based there was the second one then after Dr. During's second medically based examination the center HR representative asked for further clarification yet another effort by the chief judge to engage Youngman in the interactive process to elicit some information anything the response from Dr. Youngman was again categorically cannot do any job in the control room including hearing, carrying on conversation, reading a computer. Maybe that goes to the reasonableness of the employers refusal to accommodate that this was an essential job function and maybe that goes to reasonableness I'm not sure that goes down goes to the breakdown of the interactive process because it seems like the real breakdown is when he stopped submitting the reports and in a way I mean if his position is I told you what I need exemption from the control room you know what the disability is and you keep asking me if anything's changed it's like asking someone who's a quadriplegic hey can you walk yet can you walk yet I mean there should have been because we're hearing it now on the reply brief virtually for the first time oh I could have worked in there temporarily well every assignment to the control room is temporary if it's you know I'm not sure that's quite fair I mean I will grant you that there were some ambiguities in Dr. Doering's various reports but if we you know and also the other doctor but if we look at those reports in Mr. Youngman's favor and if we consider what Mr. Youngman was saying wasn't it clear or fairly clear that Mr. Youngman was saying the only assignment he could not do was to work in the control room and that was the only accommodation that he needed and as I noted before he had worked there on an emergency basis despite his health problems for nine days yes and he also said you would that we would want him to be the last person we wanted in the control room because he inferring from his words would have been on the floor you wouldn't have been able to contact him but to your point your honor the suggestion that because he could work in the juvenile residential areas does not get Mr. Youngman over the hurdle of having to show that he was qualified to perform an essential function and this control room is the nerve center of the operations it's where people are allowed access to the facility and egress where the people who work there who are monitoring can see what the juveniles are doing whether they're engaged in fights couldn't be a jury question of whether it really was essential given that it had been a recent change and given that he worked at the center for so many years without having to routinely do it whatever the manual said no your honor it's not a recent change it occurred in 2010 and it occurred two years before the events in this case so it's not a sudden surprise and it's it's distinct from the Miller case in which this court held that an informal accommodation of someone's inability in that case to go up at great heights show that a position was not essential there was no informality here because by the recommendation and requirement of Peoria County Board Brown was required in 2010 at the time he came in became the chief to make sure that everybody was doing every assignment that was fomented or triggered by a human rights complaint so it wasn't new it was required and it was essential I wanted to come back to something you said Judge Barrett about there's no case law exactly on point there is case law in our brief I don't have the name at hand but there is a case or two cases I believe in the last section of my brief where the concept was that the the initial request for accommodation or during the process it was too too broad I can't be in the chemical factory or I can't be exposed to children and that was deemed insufficient by this court to represent a good faith participation in the interact yeah I am aware of those cases but it was a little bit different because I can't be in the control room is a little bit different than saying I work in a high school and I can't be exposed to children that is much broader than he's taking himself out of two of three key positions if there are no further questions we would ask this court affirm the district court and it can do so based on the interactive process analysis alone without reaching the other two questions I appreciate it rebuttal mr. Smith you're gonna like to just maybe make some additional points back in late 2011 2012 Youngman was assigned to the control room and it was because of what council said they want to make sure that people were able to work in a control room well after he started working in a control room he got sick and mrs. Kramer one of the supervisors for the agency told him to later he was approached by Kramer again and said I got some bad news for you they're making me put you back in the control room then in August 1st a note is provided to the agency about indicating the problem that he's having the note which I think addressed something that you talked about in your honor the note said patient is having motion sickness related to control room he has recently been assigned to recommended patient network and control room other than briefly going in and out if needed but rather should be placed elsewhere for his job because of lights noise cameras in the room having motion sickness symptoms of lightheadedness so that the motion sickness was basically just a symptom of all of these effects of his hegemony and the pituitary gland then Youngman had given a note to the on August 5th it said I'm writing this in response to your memorandum dated August 1st my medical note the only restriction I'm requesting is not to work in the control room due to my medical condition of motion sickness I am capable and do complete all the other job duties in control however I am in the control center the following sentence occur pain ringing in the ear relates to the head and neck headaches dizziness these symptoms are brought in by the confined space in the control room this is not saying that it's throughout the whole facility this is just dealing with the control room also he had indicated that he's capable of doing work in the living units floater duties or security units so he's given them a recommendation and only thing that they do then is send him for the fitness for duty why could he do the floating duties as Mr. Siegel pointed out the floating went back and forth between the control room and the hands-on so why could he do the floater I don't think there's any evidence that says that my client isn't willing to go in there as a floater he's just was concerned of being confined in there over a long period keeping in mind that for 15 years he only went in the control room three times and then after he gives a restriction he's now working in at nine days so he feels it's almost to a point of frustration that he is not going to have an ability to control the physical manifestations of his disability so getting back to the interactive process I think he did make recommendations they did have some idea of what they could do for him they didn't say he couldn't work in security they didn't say just did living units they just said control room period so I think that that is an important thing for this court to consider with that said with the closing I'd certainly like if this court would look closely at that interactive process I do believe that this court may need to give us more guidance as to what is the duty of the employer if they know information that they can provide to the client to make it so that they be able to go into the interactive process where they would say we only need you to work in there once a week and if he says no well that was his choice but I think there has to be some way of knowing what the expectation is of the employer and I think that's what guidance is that we may need from the court is to assist us in modifying or crystallizing what the duty of the employer is thank you and I request that the court remand possibly for trial thank you the case is taken under advisement